UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN
_____

In re

STEVEN J. ENRIGHT and                                                Chapter 12
JILL K. ENRIGHT,
                                                                     Case No. 11-29169
                         Debtors.
_____

GREAT LAKES AGRI-SERVICES, LLC,

                         Plaintiff,

v.                                                                                            Adversary No. 11-2868

STATE BANK OF NEWBURG,

                         Defendant.
_____

MEMORANDUM DECISION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND OBJECTION TO CONFIRMATION OF PLAN
_____

       This matter came before the Court on the plaintiff Great Lakes Agri-Services, LLC's motion for summary judgment seeking an order requiring the marshaling of assets, namely by requiring the State Bank of Newburg to liquidate the real property mortgaged by the non-debtors, Kenneth and Janet Enright, prior to executing on the real property mortgaged by the debtors, Steven and Jill Enright, in which Great Lakes also has a secured interest. The defendant State Bank of Newburg opposed the motion. The parties filed briefs supporting their respective positions and the Court took the matter under advisement.

       This is a core proceeding under 28 U.S.C. § 157(b)(2)(K), and the Court has jurisdiction under 28 U.S.C. § 1334. This decision constitutes the Court's findings of facts and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

BACKGROUND

The parties have stipulated to the following facts. During the 1990s, Kenneth and Janet Enright owned the farmland and operated a dairy farm at which their son, the debtor Steven Enright, worked. Steven Enright and his wife, debtor Jill Enright, borrowed money from the State Bank of Newburg ("Bank") to buy dairy cows and for other improvements to the Enright dairy farm. Any such dairy cows purchased in the 1990s by Steven and Jill were integrated into the herd of dairy cattle at the Enright dairy farming operation. During that same time period, Steven and Jill Enright received an increasing portion of the milk check proceeds from the farming operations.

Also during the 1990s, the Bank demanded that Kenneth and Janet Enright guarantee, through unlimited guarantees, Steven and Jill's loans with the Bank. Then, by letter dated September 17, 2001, Kenneth and Janet Enright indicated they "will no longer guarantee any additional loans taken out by Steven and Jill Enright." (Stipulation of Facts ¶ 4). Early in 2001, Steven Enright indicated to the Bank that he wanted to develop a plan to transfer ownership of the farm to himself, but that his father was not yet willing to do so. In 2003, the dairy farming operation was transferred by Kenneth and Janet Enright to Steven and Jill Enright, as the Kenneth/Janet herd was culled and replaced by Steven/Jill stock, with Steven renting facilities from his parents and buying feed from a brother.

On February 6, 2002, the State Bank of Newburg created a summary of Steven and Jill Enright's debt to the Bank. According to that summary, Steven and Jill had debt totaling $2,059,669.00, including nine loans from the Bank totaling $1,434,628.00. The balance of the debt was owed to other banks or lenders.

2

On April l8, 2002, Kenneth and Janet Enright signed a Limited Guaranty ("Guaranty") of the debts of Steven and Jill Enright to the Bank. The Guaranty provided in part as follows:

> For value received and to induce State Bank of Newburg ... to extend credit or to grant or continue other credit accommodations to Steven J. Enright and Jill Enright ... [Kenneth and Janet Enright] jointly and severally guarantee payment of the Obligations defined below when due ....
>
> "Obligations" means all loans, drafts, overdrafts, checks, notes, and all other debts, obligations, and liabilities of every kind and description, whether of the same or a different nature, arising out of credit previously granted, credit contemporaneously granted, or credit granted in the future by Lender to Debtor.
>
> This Guaranty is also secured (to the extent not prohibited by law) by all existing and future security agreements between Lender and any of the undersigned and by any mortgage stating it secures guarantees of any of the undersigned.

(April 18, 2002, Continuing Guaranty (Limited), Exhibit 1 to Stipulation of Facts).

The Guaranty limited Kenneth and Janet's liability to "$500,000, plus costs of collection," and further provided that they were "being asked to guarantee a limited amount of the past, present and future Obligations of Debtor." (April 18, 2002, Continuing Guaranty (Limited), Exhibit 1 to Stipulation of Facts).

Stapled to the Guaranty in the Bank's records is a 1986 Agricultural Real Estate Security Agreement. (March 13, 1986, Agricultural Real Estate Security Agreement, Exhibit 2 to Stipulation of Facts). Kenneth and Janet Enright had previously executed the Agricultural Real Estate Security Agreement in favor of the Bank, and the real estate listed thereon "secures all debts, obligations and liabilities of any Customer to Bank arising out of credit previously· granted, credit contemporaneously granted, or credit granted in the future by Bank to any Customer, to any Customer at another, or to another guaranteed or endorsed by any Customer." (March 13, 1986, Agricultural Real Estate Security Agreement, § 2, Exhibit 2 to Stipulation of

Facts).

The Agricultural Real Estate Security Agreement from Kenneth and Janet Enright to the Bank is security and collateral for Kenneth and Janet's Guaranty of Steven and Jill's debts with the Bank. Some parcels of real estate which originally served as collateral on the Agricultural Real Estate Security Agreement have since been sold and released by the Bank. Currently, the real estate identified in that security agreement consists of approximately 68.55 acres of land owned by Kenneth and Janet Enright.

In 2003, the Enright family, Kenneth and Janet, and Steven and Jill, retained the Twohig law firm of Chilton, Wisconsin to "prepare an agreement which defines the parties' business relationships and provides a succession plan for your family's farm business. Each of these services is necessary for your family's farming business to continue." A copy of the draft agreement was provided to the Bank. That draft states that "the parties have been operating a quasi joint venture farming business called 'Enright Farms.'" (Stipulation of Facts ¶ 13).

On May 12, 2003, the State Bank of Newburg prepared a another balance sheet relating to Steven and Jill Enright which, among other things, summarized the debt of Steven and Jill, including all debt to the Bank. That summary shows that as of May 12, 2003, there were 11 loans from the Bank to Steven and Jill totaling $1,708,113.00 out of total liabilities of $2,103,513.00. All of the note numbers assigned by the Bank for those 11 loans were new numbers when compared to the note numbers on the 2002 summary.

On September 29, 2003, Kenneth and Janet Enright signed a Real Estate Mortgage in favor of the Bank to refinance a previous mortgage loan. (September 29, 2003, Real Estate Mortgage, Exhibit 3 to Stipulation of Facts). The mortgage was filed on September 30, 2003,

4

with the Washington County Register of Deeds, as Document No. 1020031. Under the 2003 Real Estate Mortgage, the Bank received a security interest in real estate owned by Kenneth and Janet. Although there is some overlap between the real estate listed on the 2003 Real Estate Mortgage and the 1986 Agricultural Real Estate Security Agreement, the 2003 Real Estate Mortgage secures approximately 298 acres, of which approximately 230 acres are not collateral under the 1986 Agricultural Real Estate Security Agreement.

Under paragraph 5 of the 2003 Real Estate Mortgage, the real estate secured, among other things, payment to the Bank as follows:

> This Mortgage secures prompt payment to Lender of (a) the sums stated in the first paragraph of this Mortgage, plus interest and charges according to the terms of the promissory notes or agreement of Borrower to Lender identified on the reverse side, and any extensions, renewals or modifications signed by any Borrower of such promissory notes or agreement, (b) to the extent not prohibited by the Wisconsin Consumer Act (i) any additional sums which are in the future loaned by Lender to any Mortgagor, to any Mortgagor and another or to another guaranteed or endorsed by any Mortgagor or primarily for personal, family or household purposes and agreed in documents evidencing the transaction to be secured by this Mortgage, and (ii) all other additional sums which are in the future loaned by Lender to any Mortgagor, to any Mortgagor and another or to another guaranteed or endorsed by any Mortgagor.

(September 29, 2003, Real Estate Mortgage, Exhibit 3 to Stipulation of Facts).[1]

On February 17, 2004, the Bank again prepared a balance sheet for Steven and Jill Enright showing all of their debts. Steven and Jill signed this balance sheet on February 20, 2004. That balance sheet showed 10 loans from the Bank to Steven and Jill totaling

---

[1] Great Lakes Agri-Services, Inc., contends that, by its terms, and read in conjunction with the terms of the Guaranty, the 2003 Real Estate Mortgage secures any sums which were loaned from the Bank to Steven and Jill Enright after the date of the 2003 Real Estate Mortgage, including money loaned by the State Bank of Newburg to pay notes which came due and were renewed with a new note. Thus, the mortgage would secure Steven's and Jill's refinanced notes, notwithstanding Kenneth's and Janet's letter stating they did not with to be liable for future loans.

5

$1,900,448.00 out of total liabilities of $2,573,417.00. Four of these 10 loans have new loan numbers. The debt on the four new loans totaled $1,634,834.00.

The Bank maintains a collateral register for its secured loans. Since the 2002 Guaranty from Kenneth and Janet of the debt of Steven and Jill to the Bank, the Bank's records consistently show the Kenneth and Janet $500,000.00 Guaranty among the collateral or security for the loans to Steven and Jill. The collateral register does not list the collateral backing the Guaranty, but the Agricultural Real Estate Security Agreement was stapled to the Guaranty in the Bank's files. All of Steven and Jill's notes now have new note numbers as compared to the 2003 and 2004 note numbers. All notes in existence in 2003 at the time of the execution of the 2003 Real Estate Mortgage have been paid by new notes from Steven and Jill.

By letter dated May 8, 2008, Kenneth and Janet Enright again gave the State Bank of Newburg notice of their intent to revoke their Guaranty of April 18, 2002. On April 23, 2008, Steven and Jill's debt to State Bank of Newburg was $2,381,660.00. There was no meaningful change in the amount of the debt between April 23, 2008, and May 8, 2008.

According to the Chapter 12 Plan filed by the debtors,

> [T]he Debtors owns [sic] a dairy farm operation in Washington County, Wisconsin. They have a little more than 100 acres of land and a free stall barn, rented from Steven J. Enright's father, Kenneth Enright, which has a capacity for 420 cows. The Debtors began farming on their own account around 2002 and have been financed by Newburg since the inception of their operation.

(November 7, 2011, Chapter 12 Plan of Reorganization Article IV, § C).

The summaries of the debt of the debtors to the Bank show that each year, from 2001 to the present, there were new loan numbers, new notes were signed by the debtors, loan proceeds were used to refinance debt to the Bank, to consolidate debt owed to third parties, to finance

capital purchases, and to finance operating expenses of the farm.

On September 26, 2011, Great Lakes Agri-Services, Inc. ("Great Lakes") filed a proof of claim in the bankruptcy case for $363,014.77. This amount is based on amounts owed by the debtors to Great Lakes for goods (feed) sold from Great Lakes to the debtors, as well as interest that accrued on the principal amount due prior to the filing of the bankruptcy petition. To secure credit extended from Great Lakes to the debtors, on April 28, 2009, the debtors granted Great Lakes a security interest in three real estate properties owned by them: 9031 Orchard Valley Road, West Bend, Wisconsin, with Tax Key # TF 0262; 9059 Orchard Valley Road, West Bend, Wisconsin, Tax Key # T4 0262 OOB and T4 0262 OOC; and 20 acres of vacant land in Farmington, in Washington County, Wisconsin, Tax Key # T4 0250 OOY. (April 28, 2009, "First" Real Estate Security Agreement, Exhibit 4 to Stipulation of Facts).

The First Real Estate Security Agreement was filed with the Washington County Register of Deeds on April 29, 2009, as Document No. 1218808. The Agreement indicates that the real estate secured "all debts, obligations and liabilities of any Borrower to Lender arising out of credit previously granted, credit contemporaneously granted or credit granted in the future by Lender to any Borrower, to any Borrower and another, or to another guaranteed or endorsed by any Borrower ('Obligations')." (April 28, 2009, "First" Real Estate Security Agreement, ¶ 2, Exhibit 4 to Stipulation of Facts). Further, under the first agreement, debtors agreed to pay all reasonable attorneys' fees incurred by Great Lakes in enforcing the agreement to the extent not prohibited by law. (April 28, 2009, "First" Real Estate Security Agreement, ¶ 3(g), Exhibit 4 to Stipulation of Facts).

On April 28, 2009, in order to further secure credit extended by Great Lakes to the

7

debtors, the debtors also granted Great Lakes a security interest in 57 acres of Vacant Land in the Town of Scott, in Sheboygan County, Wisconsin, Tax Key #s 59022315410, 59022315460, 59022315480, and 59022315422. (April 28, 2009, "Second" Real Estate Security Agreement, Exhibit 5 to Stipulation of Facts). The second agreement was filed with the Sheboygan County Register of Deeds on April 29, 2009, as Document No. 1876305. According to the Second Real Estate Security Agreement, the real estate secured "all debts, obligations and liabilities of any Borrower to Lender arising out of credit previously granted, credit contemporaneously granted, or credit granted in the future by Lender to any Borrower, to any Borrower and another, or to another guaranteed or endorsed by any Borrower ('Obligations')." (April 28, 2009, "Second" Real Estate Security Agreement, ¶ 2, Exhibit 5 to Stipulation of Facts). The second agreement also indicates that the debtors agreed to pay all reasonable attorneys' fees incurred by Great Lakes in enforcing the agreement to the extent not prohibited by law. (April 28, 2009, "Second" Real Estate Security Agreement, ¶ 3(g), Exhibit 5 to Stipulation of Facts).

As additional security, on April 28, 2009, the debtors executed a General Business Security Agreement ("GBSA") in favor of Great Lakes, providing Great Lakes with a security interest in substantially all of their assets, including, but not limited to, livestock and poultry, crops, machinery, inventory, general intangibles, accounts and all farm products. (April 28, 2009, General Agricultural Business Security Agreement, Exhibit 6 to Stipulation of Facts). Great Lakes perfected its security interest in the assets listed in the GBSA by filing a UCC Financing Statement on May 1, 2009, Document No. 090005412113. Under Article 7 of the GBSA, the debtors agreed to reimburse Great Lakes for any expense incurred by Great Lakes in protecting or enforcing its rights under the GBSA before and after judgment, including

8

reasonable attorneys' fees and legal expenses.

All of the debt of Steven and Jill Enright to the State Bank of Newburg was incurred as a part of their dairy farm operations. Comparing the debt that existed at the time of the 2003 Real Estate Mortgage to the debt existing at the time of the filing of the bankruptcy petition, all of the promissory notes evidencing the indebtedness of Steven and Jill to the State Bank of Newburg are new promissory notes and all of the debt over the sum of $1,708,113.00 (pursuant to the terms of the plan, the present debt of Steven and Jill Enright to the State Bank of Newburg is $2,298,446) is additional debt incurred to refinance debt to the Bank, to consolidate debt owed to third parties, to finance capital purchases, and to finance operating expenses of the farm.

Great Lakes objected to the debtors' proposed plan due, in part, to its treatment as an unsecured creditor. If the doctrine of marshaling is applied, then Great Lakes will have a secured interest in and, to certain assets pledged to it as collateral by the debtors and the State Bank of Newburg, will remain fully secured and be entitled to treatment as a secured creditor under the plan of reorganization. Great Lakes also filed this adversary proceeding, followed by the subject motion for summary judgment, seeking an order declaring that its claim is secured.

ARGUMENT

The plaintiff, Great Lakes Agri-Services, LLC, argues that Kenneth and Janet Enright's guaranty and security supported the State Bank of Newburg's extension of credit to the debtors, Steven and Jill Enright. As such, the guaranty and security is treated by the Bank as part of the collateral securing repayment of the debtors' obligation to the Bank. Because the Bank has treated Kenneth and Janet Enright's guaranty and security as a contribution to the capital of the debtors' farming operation, the Court should also treat the guaranty and security as part of the

9

collateral available to secured creditors.

Great Lakes contends that the mortgages provided by Kenneth and Janet Enright are comparable to the mortgages provided by the officers and principal shareholders in *Moser Paper Co. v. North Shore Publ'g Co.*, 83 Wis. 2d 852, 266 N.W.2d 411 (1978), in that they secured the obligations of the debtors directly. Although record title to the real property remains in the names of Kenneth and Janet Enright, by mortgaging their property to secure the debtors' obligations, they have, "in the eyes of equity, ... placed their residences in the company till." *Moser*, 83 Wis. 2d at 864. Accordingly, the guaranty and collateral provided by Kenneth and Jill Enright serve as a fund out of which the obligations of the debtors can be primarily satisfied and to which marshaling should be applied. None of the State Bank of Newburg's security will be taken away from it by application of the doctrine of marshaling in this case.

The defendant, the State Bank of Newburg, opposes the motion for summary judgment, arguing the elements of the doctrine of marshaling have not been satisfied. Namely, there is no evidence that Steven and Jill Enright's business assets and Kenneth and Janet Enright's 1986 Agricultural RESA or 2003 Mortgage are "two funds belonging to a common debtor." *See In re Wm. Pietsch Co.*, 200 B.R. 207, 210 (Bankr. E.D. Wis. 1996). According to the Bank, Great Lakes' analysis improperly treats Kenneth and Janet Enright and Steven and Jill Enright as principals of the same business. Steven and Jill incurred the debt and received the loan proceeds. Kenneth and Janet helped out their son and daughter-in-law by partially guarantying the debt; there is no corporate veil to pierce in this case and the non-debtor collateral was never treated as a contribution to the debtors' capital. Kenneth and Janet Enright's Agricultural RESA and 2003 Mortgage is security for the Limited Guaranty, not direct collateral for Steven and Jill Enright's

10

debts. Because Great Lakes did not rely on Kenneth and Jill's Limited Guaranty when it granted credit to Steven and Jill, it would be unfair to allow Great Lakes to bootstrap its way into secured status at the expense of a third party. Additionally, if the State Bank of Newburg was required to marshal against Kenneth and Jill's real estate, then the latter would have the right to subrogate to the Bank's right against the remaining collateral, leaving Great Lakes's claim unsecured. *See* 11 U.S.C. § 509; *In re Leviton Constr. Co.*, 122 B.R. 530 (Bankr. S.D. Ohio 1991); *In re Lomb*, 74 B.R. 711 (Bankr. W.D. Pa. 1987).[2]

DISCUSSION

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The parties have stipulated to all material facts.

The equitable doctrine of "marshaling assets" is generally described as follows:

---

[2]Great Lakes counters that subrogation is not applicable because there has not been any payment by the co-debtor, let alone an involuntary payment, as required under 11 U.S.C. § 509. This Court agrees.

11

> Marshaling is traditionally used to prevent a junior lienholder with a security interest in a single property from being squeezed out by a senior lienholder with a security interest not only in that property, but also in one or more additional properties. The equitable principle of marshaling benefits a junior secured creditor by requiring a senior secured creditor to first attempt to collect amounts owed it from a property or fund in which the junior secured creditor has no interest, thereby producing a greater possibility that there will be remaining value in the fund from which the junior secured creditor can be paid. The doctrine of marshaling may be applied for the benefit of a junior-lien creditor when the junior-lien creditor has a lien on only one of two or more properties or funds owned by a debtor and a senior-lien creditor has a lien on more than one of the properties or funds owned by the same debtor. Where two or more creditors seek satisfaction out of the assets of their common debtor, and one of them can resort to two funds where another has recourse to only one of the funds, the former creditor may be required to seek satisfaction out of the funds which the latter creditor cannot reach, before resorting to the other fund.

53 Am. Jur. 2d *Marshaling Assets* § 3 (updated May 2012). The Supreme Court has stated that the doctrine is used "to prevent the arbitrary action of a senior lienor from destroying the rights of all who have an interest in the property involved." *Meyer v. United States*, 375 U.S. 233, 237 84 S.Ct. 318, 321 (1963).

As agreed by the parties, the elements of marshaling in Wisconsin are: (1) the existence of two creditors of the same debtor; and (2) the existence of two funds belonging to a common debtor; with (3) only one of the creditors having access to both funds; and with (4) the absence of prejudice to the senior secured creditor if the doctrine is applied. *In re Wm. Pietsch Co.*, 200 B.R. 207, 210 (Bankr. E.D. Wis. 1996) (citing *Meyer v. United States*, 375 U.S. at 236-37, 84 S.Ct. at 320–21).

The parties do not dispute the existence of two creditors of the same debtor, with only one of the creditors having access to both funds. The State Bank of Newburg, however, argues there are not two funds of assets belonging to the common debtor because the real property securing the Kenneth and Janet Enright Limited Guaranty is not an asset of the debtors, Steven

12

and Jill Enright.

Traditionally, when an individual guarantees a corporate debt, the corporation and the guarantor are not considered a common debtor because the corporation is a separate entity. *In re Wm. Pietsch Co., Inc.*, 200 B.R. 207, 210 (Bankr. E.D. Wis. 1996). There are, however, widely-held exceptions to the "common debtor" element. As this Court has previously noted:

> In the corporate context, marshaling has traditionally been allowed even though the common-debtor rule has not been met in only two situations: (1) where the corporate veil could properly be pierced so as to ignore the ostensibly separate identities of a shareholder and the corporation; and (2) when a shareholder's property should be deemed to be a contribution to the capital of a corporation. But as this court previously noted, "[e]ven the rule that recovery from a guarantor will not be compelled before resorting to the debtor's assets is not absolute." *Wm. Pietsch Co.*, 200 B.R. at 210. A corporation's guarantor's property, pledged to secure a corporate obligation but not solely the guarantor's obligation, may be regarded as contribution to the capital of the corporation and thus subject to marshaling. *Id.* at 210–11 (citing *Farmers and Merchants Bank v. Gibson*, 7 B.R. 437, 440 (Bankr. N.D. Fla.1980), *vacated and remanded*, 81 B.R. 79 (N.D. Fla. 1981)).

*In re Vission, Inc.*, Case No. 07-21957, 2008 WL 2230741 *6 (Bankr. E.D. Wis. May 28, 2008) (unpublished).

This "Wisconsin Exception" of marshaling non-shared collateral owned by a guarantor of the debtor's obligation is not without its detractors. *See In re Sunset Hollow Props., LLC*, 359 B.R. 366, 379-82 (Bankr. D. Mass. 2007) (discussing cases critical of Wisconsin's "controversial" exception to the common debtor requirement). And this Court is mindful of the necessity to apply the doctrine and its exceptions both narrowly and equitably.

The facts of the present case do not fit within the recognized exceptions to the requirement that both funds belong to the common debtor. First, even if the debtors had engaged in inequitable conduct (and no party has suggested any such thing), there is no corporate veil to pierce. *Cf. Consumer's Co-Op of Walworth Cnty. v. Olsen*, 142 Wis. 2d 465, 484, 419 N.W.2d

13

211, 217 (1988) (noting element of control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to transaction attacked so that corporate entity as to transaction had at time no separate mind, will or existence of its own, required to pierce corporate veil). There is not only no allegation that the debtors had dominion and control over the senior Enrights' property, the statement of facts indicates the contrary. The guaranty is only for a portion of the debt – the amount presumably determined by Kenneth and Janet – and the parties acknowledge that Kenneth and Janet were not yet willing to relinquish control over the dairy operation on the farm they mortgaged. The mortgage of Kenneth's and Janet's property secured only their partial guaranty, not the debtors' entire debt. They also tried to distance themselves from the debtors' finances by refusing to guarantee future loans in 2008. Consequently, there is no reason to treat the debtors and the senior Enrights as a single entity, so there is no common debtor in this case.

> Second, the capital contribution exception is also inapplicable. That principal provides:
>
> when a guarantor who is also a controlling shareholder provides the lender with the primary collateral needed to obtain a working capital loan to either initiate or continue the operation of the debtor corporation, the "common debtor" requirement is satisfied and the equitable remedy of marshaling is available.

*In re Tampa Chain Co.*, 53 B.R. 772, 778 (Bankr. S.D.N.Y. 1985), *cited in Wm. Pietsch Co.*, 200 B.R. at 211; *cf. Farmers and Merchants Bank v. Gibson*, 7 B.R. 437, 441 (Bankr. N.D. Fla. 1980), *cited in Wm. Pietsch Co.*, 200 B.R. at 210 (where sole shareholder guaranteed working capital loan and secured creditor relied solely on guarantor and not debtor corporation for repayment, guarantee viewed as contribution to capital). No gift of their property to the debtors was intended at the time of the granting of the mortgage, and gradual transfer of the dairy operation came years later. Although this Court does not have intimate knowledge of the

14

parties' personal relationships, it can confidently rely on the fact that Kenneth and Janet Enright are not controlling shareholders of Steven and Jill Enright, or as noted above, vice versa.

Furthermore, "marshaling will not be applied to the detriment of a third party having an equity equal or superior to that of the person seeking to invoke the rule." *Moser Paper*, 83 Wis.2d at 861, 266 N.W.2d at 416 (quoting *Estate of Snell*, 227 Wis. 455, 467, 279 N.W. 24, 30 (1938)). In this case, equity does indeed favor Kenneth and Janet, and application of the doctrine would be undeservedly detrimental to them. It was the debtors, Steven and Jill Enright, who filed a petition for relief seeking reorganization of their assets to pay their liabilities. Kenneth and Janet Enright have not filed a bankruptcy petition, are not principals of the debtors, have not conducted themselves inequitably, have not submitted their assets to the debtors at any time, nor have they submitted their assets to this Court for liquidation. Marshaling is not appropriate under these facts.

Accordingly, Great Lake's motion for summary judgment is denied. The portion of Great Lake's objection to confirmation relating to its demand for marshaling is also overruled for the same reasons. Separate orders in the adversary proceeding and the main case will be entered. The defendant did not file a cross-motion for summary judgment or motion to dismiss in this adversary proceeding, so the Court will schedule a status conference to conclude this matter. The Court will also schedule a status conference on Great Lake's other objections to confirmation, as well as the pending objections of Deutsche Bank[3] and the Trustee.

---

[3] At a December 19, 2011, status conference, debtors' counsel stated a modified plan satisfying Deutsche Bank's objection to confirmation would be filed. Since a modification has not yet been filed, that objection is still technically pending.

15

July 27, 2012

Margaret Dee McGarity
United States Bankruptcy Judge

16